Good morning, Illinois Appellate Court, First District. Court is now in session, the Fourth Division. The Honorable Justice Robert E. Gordon presiding. Case number 1-9-0692, People v. Abdullah Al-Jahani. Okay, would the lawyers who are going to argue the case please introduce themselves to the court? Sure, Assistant State's Attorney Iris Ferrosi. Good morning, Your Honors. Stephen Hall for Mr. Abdullah Al-Jahani. Okay, the appellant, do you want to reserve some time for rebuttal? Please, Your Honor, three minutes. Okay, that'll be fine. Let's proceed. May it please the court, counsel, my name is Stephen Hall and I represent the appellant, Mr. Abdullah Al-Jahani. Just as an initial point of clarity during the argument, I'll refer to my client as Mr. Al-Jahani and Talal Al-Jahani as just that, Talal Al-Jahani. We raised four issues on appeal in our brief this morning. Due to time, I do intend to only focus on one of the issues and that is the denial of Mr. Al-Jahani's motion to suppress. However, I am prepared to answer questions on all of the issues which we raised. We are asking this court to reverse the decision of the trial court when it denied Mr. Al-Jahani's motion to suppress. And we ask this court to make that finding because the Fourth Amendment to the Constitution protects individuals from warrantless searches of their houses, their papers, and their effects. A warrantless search like the one that we have in this case is per se unreasonable. And although the state argued at the hearing on the motion to suppress that the officers were engaged in their community caretaking function, the events of March 15, 2015, and the testimony that was actually offered at trial and the motion to suppress, which were combined, do not support that argument. The trial court's denial of that motion, agreeing with the state that the officers were engaged in the community caretaking function, was in error. To support this decision, the trial court relied legally exclusively on People v. Hand, which is distinguishable in this matter, and I will discuss that in a moment. As the Illinois Supreme Court explained in People v. Asher, this court must give deference to the findings of fact by the trial court related to the motion to suppress unless they are against the manifest weight of the evidence. This court then trial court credited Officer Lugo's testimony about events on March 15, 2015, as truthful, should be granted deference. But the trial court's conclusion that Officer Lugo did not actually believe that everything was okay when he left the front door of Mr. Aljahani, that can be reviewed de novo, along with the trial court's ultimate denial of the motion to suppress. Now, for clarity, the opinion that I'm referring to and the specific excerpt from the trial court that I'm talking about is found in the record on page 95, and I'd like to read just that very specific quote from the trial court in rendering its opinion. As I indicated yesterday, ruling on the motion, that expression by Officer Lugo certainly is not any kind of acknowledgment by them that everything was okay. It was just what was said to Mr. Ali at the time. Clearly, Officer Lugo did not think everything was okay, because otherwise, he and his partner would not have gone around to the back of the apartment building and gained entrance via that room. Again, record 95. The case law is clear. Community caretaking describes a stop to check on a person's examples that of that function include helping children find their parents, mediating noise disputes, responding to calls about missing persons or sick neighbors, even helping inebriates find their way home. And although that list, which is from People versus McDonough, is illustrative, it's not exhaustive. The examples, though, are still a far cry from responding to a burglary in progress, which was the situation we had here. Pursuant to the Illinois Supreme Court's opinion in McDonough, their community caretaking exception applies when two criteria are demonstrated. First, that the court must determine that the police were performing some function other than the investigation of a crime. And second, the court must determine if the search or seizure are reasonable because it was undertaken to protect the safety of the general public. For both of here, the situation fails both of those criteria. The officers were responding to a call of a battery in progress. They necessarily were not checking on a person's well-being independent of the thought of criminal activity. While they may have been concerned for a potential victim, that is not independent or totally divorced from their act in investigating a battery as well. And this point is clear when the facts of this case are compared with the facts of other cases, such as People versus Smith, which I believe was cited by the state, or People versus McRip, M-I-K-R-U-T, if I'm saying that right, as cited by us. And when Officer Lugo testified that he believed the officer's job was done after they talked with Mr. Aljahani the first time, and they were also satisfied that things were okay. That's what he testified to a trial. Even if the trial court did not give that credence, the trial court did find Officer Lugo to be credible and truthful. The officers were further satisfied that things were fine even after the second trip upstairs when there was no response to the knocking. The officers were still satisfied that everything was okay when they punched in a code on their PDT in order to communicate with their dispatch. If the officers actually believed that there was someone who needed their aid, someone in an apartment that was in need of immediate assistance, they would have pushed their way into the apartment to check on that person when Mr. Aljahani opened the door the first time. Or at the very least, they would have asked to see Talal Aljahani and make sure that he was okay. And that type of action would have been completely in line with the case that trial court relied on, which is people versus hand. In hand, there was a man and wife. They shared a home. They had children together. And the man, for whatever reason, was not home but was concerned about the safety of his children who were there with his wife. His wife had a history of mental health illness, and he called the police, and he simply asked them, would you mind accompanying me to my house to check on my children? I'm afraid they're not being fed, and I want to make sure they're okay. That is the perfect example of a community caretaking function, which starts out with no thought of criminal activity. So the police travel with the man to the house. They confirm that the woman is indeed inside the house with the children, and although she's not responsive, she indicates that at some point she might open the door. When she ultimately does not, the police use the key from the husband, open the door, and as soon as they do that, the woman swings a baseball bat at one of the officer's heads. Now, the fact that criminal charges came later in time does not mean that the situation in hand falls outside of the community caretaking function because at the outset, the officers had only a concern for those children and were not investigating any crime. Again, an entirely different situation than we have here because this case started out as an investigation of a battery, and from our perspective, at no point did that change. The state argues in its brief, and this is a quote from page 17 of the state's brief, under the first prong of the emergency aid, I'm sorry, under the first prong of the emergency exception, Officer Lugo had a reasonable grounds to believe that there was an emergency, a suspected battery, or worse, within the second floor apartment, and an immediate need for his assistance for the property. Immediate, an immediate need, but they waited 15 to 20 minutes from the time they first encountered Mr. Ali at the apartment building to the time they entered the rear door of Mr. Al-Jahani's apartment. If the officers truly believed that there was an emergency, if there was a need for assistance to aid someone inside, they would not have waited 15 to 20 minutes to walk around to the front or the back door. They would have entered immediately, as they did in People versus Hand. The passage of time here weighs against a finding of the warrantless entry being accepted by the community caretaking function, as it did in People versus Fedder, F-E-D-D-O-R, which was commented on by the court in People versus Lomax. In Fedder, the officers believed that someone had been driving under the influence, located his car, parked in a driveway, and tried to get access to the home, knocking on the door and whatnot, and they received no response. So, they called the fire department 10 minutes after they arrived. Ultimately, they did gain entry and tried to claim that there was a community caretaking function at play. The court in Lomax commented on that and noted that if the officers really believed that someone inside needed their assistance in an emergency capacity, they would have responded more quickly. And the fact that 10 minutes elapsed strongly suggested that they did not actually believe there was an emergency inside the home. And from our perspective, there's the same situation here. In the cases cited both by us and by the state where the community caretaking function has been asserted and agreed with by the courts, the officers have offered very specific reasons for their belief that someone needed aid. Then they acted in accordance with that belief, as they did in People versus Woods and again in Lomax. But here, Officer Lugo was only able to state that, quote, something didn't feel right. From our perspective, that is nothing more than a hunch. And of course, a mere hunch is not sufficient to support any type of search or seizure, let alone allow the entry and search of a person's home without a warrant. As we know from Florida versus Sardinas, the home is first among equals. For the second prong, whether the search was reasonable because it was undertaken to protect the safety of the general public, it was not. The passage of time, Officer Lugo's truthful testimony at the hearing that everything was fine, and the officer's actual actions, all belie that assertion that they believe someone inside the apartment was actually in need of aid. And as a final matter, the state argues on page 19 of its brief that once the officers saw the back door of the apartment was open, received no response, they had every right to enter the apartment. Every right. No, we reject that fully. That argument is Mr. Aljahani had the right, the right not to have officers enter his home without a warrant and poke around because, quote, something didn't feel right. That argument flips the Fourth Amendment and its protections on its head. And now it would be the officers who have the right to enter as they see fit, not the private citizen who has the right against it. For those reasons, the reasons we said in our brief, we asked this court to find that the trial court was in error on the motion to and take other action as we have requested in our brief. Any questions by Justice Lincoln? No, thank you. Anything by Justice Reyes? No questions right now. Okay, let's hear from the state. Morning, Your Honors. Can everybody hear me? Yeah, we can hear you. Okay, I can't tell if you can hear me. The community care, so let me start here. Police officers wear two different hats. They wear the investigating crime hat many times, and they wear a protecting the public safety hat many times. And sometimes these two things change at a split moment, and police officers have to make a split decision. And it's sometimes they occur at the same time, which is responded to multiple 911 calls of shots being fired inside of someone's apartment. And that this court said alone justified the police entry into that apartment. That was a both crime investigation and making sure that there weren't victims in there that were seriously injured. I feel like the courts have kind of both community caretaking and emergency aid fall under the same police hat of taking care of the public. And in McDonough, and the cases cited by defendant, these are all cases where the courts have held that a car that stopped on the side and a police officer pulling up behind it with no information whatsoever, and putting on emergency equipment alone constituted a seizure. That's what McDonough held. That is different than the emergency aid exception, because the McDonough cases deal with seizure, a seizure based on no reasonable suspicion, no nothing. It's just a seizure based on a car being stopped at the side of the road. What we have an emergency aid is the police having information and that there might be an emergency and someone might need help and they enter a home based on the belief that there's an emergency. That is exactly what happened here. When you look at the facts of what happened, Mr. Ali, the witness in this case called 911. The police arrived relatively quickly. He's waiting outside for the police and tells the police, I heard an argument and wrestling and someone saying to someone else, are you okay? Get up. And the police went upstairs. This is a two flat building. They go upstairs to the defendant's apartment, knock on the door, and defendant opens the door 12 inches only and says, my brother, turns out it's not his brother, but the victim is asleep. So this is moments after some large, possibly violent fight. Mr. Aljahani, the victim is already asleep. But that's all they have. So they go back down to the landing, speak with Mr. Ali again, who's adamant that something has happened that's sinister, that something really bad has happened. So moment, it's only minutes passing, the police go back up to the apartment and defendants not answering the door. So either the defendant fell asleep immediately knowing that the police are outside there, his door inquiring about a fight that just happened or something else has happened. But the police then go to the back, drive down the alley and see all the doors open, meaning the door to the garage, the door to the apartment building and defendant's door. And this is at four in the morning, have you? And this is after their knowledge that they just spoke to the defendant and moments later, he's no longer answering the door. So at that point, at that point is when the emergency occurred. All the totality of the circumstances. And at that moment, with the doors being wide open, something possibly has gone wrong up in that apartment. So when the police go up, they knock and announce again, no responses. And they don't go in and start digging, like crawling through crawl spaces and looking through drawers and backpacks and looking for evidence. They do a limited search and just go into the bedroom where they find the victim non-responsive. So all of this is reasonable. Council points to a lot of subjective factors, which are irrelevant in this analysis. It's all objective. And what would be objectively reasonable for a police officer based on the totality of the circumstances. And in this case, they were not going in like a exigent circumstances situation, chasing a defendant to go arrest him for a crime. This is very, very well thought that the defendant has fled. He's not answering the door. They after they just spoke to him and all the doors are wide open. So it was reasonable for them to enter just for the limited search of making sure that that this other person that was inside who is the victim was okay. So again, the subjective thoughts of the police are irrelevant and its context is everything. And in the context here and the split decision that the police made when they went around the back and all the doors are open at four in the morning made all of this 100% reasonable under the emergency aid exception. Let me think. So the council stated that the police waited 15 minutes and that the police that this was a true emergency should have busted through the door at the point when they knocked on the door and defendants that everything was okay. Um, that might have been more of a hunch. Um, that might have been unreasonable. Um, and they didn't act on recently. They didn't just bust to the door because these aren't exigent circumstances. Um, which is, you know, an emergency is occurring and they're trying to find a defendant. Um, they had more conversation with Mr Ali and went to the back. Um, and at that point, maybe the emergency wasn't occurring, but once they saw the doors open and this court should look at all of the, um, all of us, all the, uh, circumstances that were present and not just at certain points of the, what the defense council calls, um, the police investigation. And the courts have moved from the community caretaking, which is police staff at the side of a road where you can't be investigating a crime to, uh, emergency aid, which is entering a apartment and people versus hand. I just want to mention the court, second district appellate court. Uh, Oh, I'm sorry. No, it is first district. It's this court, um, community caretaking, a strict community caretaking under McDonough, when in fact it should have been more of an emergency aid, but still found that at the point of the emergency, which is what this court should focus on in hand. It was when the, um, police officer knocked on the door and heard the, um, defendant inside. And then the defendant wouldn't answer the door. And at that point, the police officer believed there were children inside that possibly needed help because their mother was maybe mentally ill and possibly drunk. Um, these are all the information you received from the defendant's husband. And at the point it became an emergency is when the officer heard the, um, defendant inside, not answering the door. And that's when he got the keys from the husband and opened the door and made the, um, entrance into the apartment. It wasn't when she swung the bat at him. I mean, that definitely heightened it. It's when he, the merchant in his mind, an emergency was occurring when he knew the defendant was inside and was not answering the door. That's very similar to the situation here. Um, and at the point of the emergency, which was knowing the fact that they knew and seeing all the doors open, it was objectively reasonable for them to enter. Um, counsel says that the mere hunch that he's referring to is, um, officer Lomax's statement that he had a bad feeling. Again, that's subjective belief. It doesn't factor in whether it was objectively reasonable. Um, and a mere hunch at that point with all the information he knew, um, it was far more than that. And I would, um, submit that it was reasonable for them to enter. Um, I believe I've covered all the things I wanted to cover on that issue. And if the court has any questions about the other issues that defendant is raised, um, regarding reasonable doubt, et cetera, I'm happy to answer those. Hey, are there any questions? Uh, I don't have any. Thank you. Justice raised. Oh, I don't have any questions. Then, uh, let's hear the rebuttal. Thank you, Your Honor. Uh, just a factual correction. I believe counsel stated that the officers pulled into the alley. They saw all the doors were open, and I believe the testimony was really actually that they saw a rear gate to arrive fence and a side door to a garage that was detached from the home that were open. They got out, went to investigate that. When they did that, they saw a side door to the multi unit building that was open. So they went into that door, and then they climbed the stairs of the back of the building and saw that the rear door to the So I could be wrong, but I think that was my reading of it is that they didn't just pull up and see four separate doors open and hop out. But it is helpful that, you know, counsel for the state explained that the point of the emergency is when they see those doors open. So objectively, what? What has happened at that point? They have cleared a battery in progress as far as dispatch is concerned, and they see open doors. Uh, it's hard for me to imagine a doors. Just give them the ability ability to enter a home without a warrant and knowing all that they knew. Well, what did they know? You know, there are very few things that they knew. At that point, there were two men in an apartment. One had been asleep. One thing maybe went to sleep because it's after four in the morning when they went back for the second time. The downstairs neighbor was concerned because there was an argument. Mr Al Jahani told him there was an argument. Small argument. Everything's fine. So when they see open doors, how does that really add to the very small amount of information they already have that would then justify them making a warrantless entry into a private home? Um, moreover, I think this is equally as important is at this point of the emergency. When the situation changes from the state's perspective, what is it that actually causes it to change? Because, uh, they really haven't identified at any point how looking in these open doors is really divorced from the reason they were dispatched there, which is investigating the battery. If they're carrying over all these concerns, which they've learned, it's hard from our perspective to accept that they have completely dropped the battery investigation and now just simply worried that someone might be hurt considering the actions that were taken. Um, and with that, I think that covers the police response. Thank you. Uh, any further questions? I don't have. No, I don't have any questions. I would just say, well, it's more of a kind of synopsis. I think you left out some facts, Mr Hall. And that, um, if we look, we're supposed to be looking at this objectively. Someone does come to a battery. Um, they talk to someone who says that there's a wrestling. I hear something on the floor. I hear the guy saying, are you all right? Get up. They go to the door. They knock. The guy says, nothing's wrong. Claims the victim is his brother. And then they're going to leave. Yeah. They're investigating their battery. They go downstairs and the landlord is just adamant that something else is wrong upstairs. And so they go back upstairs and they knock for five minutes. I think that's what the evidence is. They knock for five minutes and they get nothing. And then they leave and they go at, and then they're leaving the battery that they've come there for. But with everything that the police officer has, and he says, he has this strange feeling. The strange feeling leads him to the back of the house. I mean, objectively, if I came to the back of a house at four o'clock in the morning and I see a garage door open and a door of a house open, then I'm like, what's going on? Nobody's answering the front door. Maybe I better go and check to see if this person is all right, based upon everything that I've heard. I don't think we're, I think you're asking us to look at the officer's subjective statements and not attach them to the objective facts also. It's just very hard for me to see that this is not an emergency aid situation. It's more of a statement, so you don't have to respond. I was just curious if I was responding to that or if it was just a comment, as you said. Yeah. Okay. You want to comment to that? Sure. I mean, I think one of the... In a minute. I think one of the most important objective facts there that the officers knew when they arrived, this is a multi-unit apartment building. There's the man on the first floor. There's a garden level apartment. There are the men upstairs. I'm not clear if it was one person or several people that lived in the garden floor, but even during his testimony at trial, he admitted that someone could have left and he wouldn't have seen it. But objectively, you approach a multi-unit building and there are doors open. And at this point, it's no longer four in the morning. It's getting closer to five in the morning because of just the passage of time. That's not an unreasonable time for people to wake up and go to work. Having been there in the past myself, I can understand why they might put those pieces together and say, well, we should go check on this person. But from our perspective and looking at the case law as it is, it's a very thin basis to then make a warrantless entry into a home. From our perspective. It's a door open to the apartment though. You just said that it's reasonable that they would... My email is saying I'm unstable. I hope you can hear me. I can hear you. Maybe it is reasonable that they would go and they check. But when they get upstairs and there's an open door, what do they do then with the open back door when they knock a few minutes ago on the front door and no one has answered and twice a landlord has told them, I think there's something wrong with the other guy upstairs. Get a warrant. All they have to do is make a phone call and get a warrant. I know, I know. But there are other opinions that have come out. Yeah. I'm glad it wasn't you calling in the apartment when they're waiting to get the warrant to say. Well, if I may very briefly, and I might get this wrong, but I believe it was people versus you banks. Maybe it was a DUI case, but one of the discussions in there was how quick and easy it is to get a warrant these days from a technological perspective. Not saying that any standards are relaxed or anything else has changed, but when officers are driving to a hospital to get a blood draw, the driver's driving, the partner should be on the phone making the call to get a warrant. But that's obviously just my perspective. You've given us a very interesting case and very interesting arguments, good arguments by both of you and a good job on the briefs and we'll have an order or an opinion to you shortly. Thank you. The court will be adjourned. Everybody be safe. Thank you.